UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 9:23-CR-80063-DMM

UNITED STATES OF AMERICA,
              Plaintiff,

vs.

MICHAEL THOMAS DOLCE,
              Defendant.                    /
_____

### DEFENDANT'S MOTION FOR DOWNWARD VARIANCE & SENTENCING MEMORANDUM

Michael Dolce committed the offense of possessing child pornography on his home laptop computer. Mr. Dolce did not create or produce the images he possessed and is unlikely to reoffend. For the reasons expressed below, Mr. Dolce asks this Court to grant a downward variance from the sentencing guidelines.

**A. Mr. Dolce Is A Non-Contact, Non-Production, Non-Distribution Offender Who Is Unlikely To Reoffend.**

Mr. Dolce watched child pornography on his home computer. He did not produce any such material. Mr. Dolce has neither had sexual contact with a child nor communicated with one with such intent and the government has no evidence to the contrary. Within days of his arrest, Mr. Dolce communicated to the government, through counsel, that he wished to enter a plea of guilty and accept responsibility. The delay in entering such a plea was entirely attributable to the laborious efforts of

the filter team, which had encountered numerous electronic devices, both at Mr. Dolce's home and at his office that needed to be searched. Yet, ultimately, illicit images were revealed to be contained on a single device, Mr. Dolce's home computer.

Dr. Michael Brannon, a licensed psychologist, determined Mr. Dolce is a low risk to reoffend. *See* Forensic Psychological Evaluation, Dr. Michael Brannon, August 19, 2023, attached as Exhibit "A" (under seal). Dr. Brannon used the Child Pornography Offender Risk Tool (C-PORT), a tool that provides risk estimates for any future sexual offending, and child pornography possession offending in particular, to assess his risk. *Id*. at 8. Dr. Brannon concluded Mr. Dolce poses a low risk of sexual reoffending in the foreseeable future. *Id*. at 8. Dr. Brannon also identified several protective factors (he displays no antisocial or psychopathic personality traits, abstains from drugs or alcohol, is actively engaged in treatment and has continued family support) that likely reduce this risk even further. *Id*. In sum, Mr. Dolce is unlikely to reoffend.

### B. The Sentencing Guideline For Possession Of Child Pornography Is Unduly Harsh.

Through the sentencing guidelines, Congress sought "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G. § 1A1.3. The Sentencing Commission has long admitted section 2G2.2, the child-pornography guideline for

non-production offenses, fails to achieve this goal primarily because the guideline authors did not anticipate that Internet and computer use would become the norm for everyone, much less the regular means for offenders to commit these crimes. United States Sentencing Commission, *Report to Congress: Federal Child Pornography Offenses* iii (2012) ("2012 Report"). Compared to the guideline authors' expectations, the typical offender's collection of child pornography has grown exponentially in both volume and variety of graphic images, including images of very young children. *Id*. In practice, section 2G2.2 imposes substantial increases to the guidelines range in non-production cases for enhancements that are common, if not pervasive.

In June 2021, the United States Sentencing Commission issued a Report to Congress on Federal Sentencing of Child Pornography, Non-Production Offenses ("2021 Report").[1] The 2021 Report examined 119 possession/receipt offenders sentenced in 2019. Each of the 119 cases had a final guidelines offense level of 28, with a range of 78-97 months, the same level suggested by the PSR in Mr. Dolce's case.

> The analysis shows considerable differences in how these similarly situated possession offenders were sentenced. The average sentence for these 119 possession offenders was 47 months,127 with the overwhelming majority (81.5%) sentenced below the guideline range.

---

[1] https://www.ussc.gov/research/research-reports/federal-sentencing-child-pornography-non-production-offenses

USSG, *Report to Congress on Federal Sentencing of Child Pornography, Non-Production Offenses* (2021), pgs. 54-5.

Mr. Dolce's case illustrates the point. Here, probation assessed two levels because he possessed material involving a prepubescent minor [PSR ¶38], four levels because he possessed material sadomasochistic images [PSR ¶39], two levels because he used a computer to view them [PSR ¶40], and five levels because he possessed over 600 images [PSR ¶41].

The 2012 Report found that non-production offenders received the prepubescent-minor and use-of-a-computer enhancements in more than 95% of cases. *Id*. at 139, Figure 6.9. Almost 75% of offenders received the sadomasochism enhancement, and nearly 70% received the enhancement for possessing more than 600 images. *Id*. at 141, Figure 6-12.

The 2021 Report found that in 2019 over 95% of non-production child pornography offenders received enhancements for use of a computer and for the age of the victim (images depicting victims under the age of 12), the enhancements for sadistic or masochistic conduct (or abuse of an infant/toddler) applied to 84% of offenders and the enhancement for having over 600 images applied to 77% of offenders. *Id*. at 4, 19.

The 2021 Report reiterated much of the 2012 Report's findings. Specifically, it concluded:

the sentencing enhancements in §2G2.2 have not kept pace with technological advancements. Facilitated by technology, child pornography offenses increasingly involve images in great quantities and of a graphic nature, often depicting the youngest of victims. These factors are already accounted for in §2G2.2 by a series of enhancements that were initially added to target more serious offenses and more culpable offenders.

However, <u>the conduct covered by four of the six enhancements— accounting for a combined 13 offense levels—has become so ubiquitous that they now apply in the vast majority of cases sentenced under §2G2.2.</u>

USSG, *Report to Congress on Federal Sentencing of Child Pornography, Non- Production Offenses* (2021), pgs. 68-9.

The §2G2.2 enhancements are meant to be applied to represent aggravating factors, but instead conflate nearly all non-production child pornography cases into the same level of severity. As the 2021 Report noted, "across all non-production child pornography offense types, §2G2.2 fails to distinguish adequately between more and less severe offenders." *Id*. at 19. Accordingly, this Court may disagree with § 2G2.2 on policy grounds, and may impose a non-guideline sentence because the guideline provision itself lacks basis in empirical data or study. *Kimbrough v. United States*, 552 U.S. 85, 89-90 (2007).

For the typical non-production offender, who, like Mr. Dolce, has little to no criminal history and accepts responsibility for his crime, the resulting 13-level increase, corresponding to a range of 18-24 months of imprisonment, without any enhancements, to a range of 78-97 months is significant and unduly punitive.

This Court has the authority to vary from the guidelines based on its belief that the policies behind the guidelines are wrong. *See United States v. Irey*, 612 F.3d 1160, 1212 (11th Cir. 2010) ("*Kimbrough* allows a district court to vary from the guidelines based solely on its judgment that the policies behind the guidelines are wrong.")

### C. Mr. Dolce's Past Trauma & Significant Efforts On Behalf Of Sexual Assault Victims Are Worthy Of Consideration For Leniency.

Mr. Dolce has accepted responsibility for his actions. While nothing absolves him of responsibility for his crime, his conduct cannot be divorced from the trauma he received as a child and throughout his life. Such trauma has contributed to his significant mental health conditions. Mr. Dolce was diagnosed with, and presently suffers from, Post Traumatic Stress Disorder, Obsessive-Compulsive Disorder and generalized anxiety disorder. [PSR ¶¶71, 74, 76-7]

At the age of seven, Mr. Dolce was abducted by his adult neighbor and held in bondage in the neighbor's basement. Mr. Dolce was sexually abused by multiple perpetrators, including the adult neighbor and his son, and forced to endure child on child sexual abuse.

Between the ages of ten and thirteen, Mr. Dolce watched helplessly as his mother slowly died from cancer over the three-year period. Shortly after his mother's passing, his father remarried. Mr. Dolce's new step-mother came with an older teenage step-sister, who routinely sexually abused Mr. Dolce's younger brother in

front of Mr. Dolce. When Mr. Dolce confronted his father about the abuse of his younger brother, urging him to stop further abuse by his step-sister, his father did nothing, and refused to intervene. Mr. Dolce's father was a verbally abusive racist. Mr. Dolce was left as a helpless witness to his brother's continued abuse until his father divorced his step-mother.

When Mr. Dolce was in college, at the age of nineteen, his father was very publicly arrested and convicted of espionage for the nation of South Africa. Despite all that he endured, Mr. Dolce persevered and graduated college and then Stetson University Law School. [PSR ¶81]

Mr. Dolce served four years on Florida Senator Walter "Skip" Campbell's staff, where he was instrumental in designing and helping passage of significant children's rights legislation for foster and adoptive children and consumer protection legislation for customers of "payday" lenders and intrastate household movers. In 2001, Mr. Dolce published a law review article addressing the insufficiencies of Florida's dependency system. *See* Michael T. Dolce, *A Better Day for Children: A Study of Florida's Dependency System with Legislative Recommendations*, 25 Nova L. Rev. 547 (2001). This article has been cited by academics and judges, including the Supreme Court of North Carolina. *See In re T.H.T.*, 362 N.C. 446, 449 n.1, 665 S.E.2d 54, 56 n.1 (2008).

It was Mr. Dolce's wish to help victims of sexual abuse. With his law license, Mr. Dolce spent decades helping child abuse survivors and combating the abuse of children. For example, in 2009, he achieved a jury verdict on behalf of a child abuse victim, totaling over $19.2 million *See Comp. Exhibit. B*.[2]

Beyond advocating in the courtroom for survivors of abuse, Mr. Dolce lobbied the Florida legislature, and testified before the Florida House of Representatives, toward changing the statute of limitations for prosecuting child sexual abuse. In doing so, Mr. Dolce shared his private childhood trauma to inspire others and champion the rights of survivors. *See Id*.

For six (6) long years Mr. Dolce financed a battle in Tallahassee against well

---

[2] Composite Exhibit B includes articles from various news papers in the following order: 1) Engelhardt, Joel. "For Abuse Victims, it's Never Too Late." The Palm Beach Post, March 13, 2007; 2) Goodman, Howard. "One Victim's quest: Extending time to name abusers." South Florida Sun Sentinel, April 12, 2007 (https://sun-sentinel.newspapers.com/image/285617103); 3) Goodman, Howard. "Statutes of Limitations apply too soon for some victims." South Florida Sun Sentinel, April 22, 2007 (https://sun-sentinel.newspapers.com/image/285630133); 4) Cah, Diana. "Jury: Pedophile Must Pay Victim $19 million." South Florida Sun Sentinel, March 12, 2009 (https://sun-sentinel.newspapers.com/image/286216040); 5) Spencer-Wendel, Susan. "Jury Orders Sex Offender To Pay Victim $19 Million." The Palm Beach Post, March 12, 2009; 6) "Give Abuse Victims More Time." The Palm Beach Post, July 11, 2009; 7) Frank, John. "Time limits will end to file sex-abuse cases." The Miami Herald, April 27, 2010 (https://miamiherald.newspapers.com/image/659456419); 8) Kram, Dara. "Crist Signs Bill To Lift Limits on Sex Cases For Victims 12 To 16." The Palm Beach Post, May 12, 2010; and 9) Dolce, Michael. "Sex-crime survivors deserve to protect their privacy." The Orlando Sentinel, February 25, 2021 (https://orlandosentinel.newspapers.com/image/716855715)

financed and politically powerful opponents, including the Catholic Church, to repeal Florida's civil and criminal statutes of limitation for prosecution of child sexual battery. *See Id*. Mr. Dolce testified nearly two-dozen times before Florida's legislature over a six (6) year period. In 2009, Mr. Dolce even created a constitutional amendment campaign to support that effort, spending thousands of dollars of his own money.[3] It worked. In 2010, the Florida legislature did repeal the statutes of limitations for child sexual battery. *Id*. For the past thirteen (13) years, victims of sexual abuse have benefitted greatly from Mr. Dolce's efforts.

In the years since the repeal of Florida's statutes of limitations, Mr. Dolce has accepted countless pro bono cases on behalf of victims of childhood sexual abuse. In addition to pro bono cases, Mr. Dolce had directed his law practice to the representation of sexual trauma survivors in Florida and other states, exclusively.

In November 2011, he became a member of the Florida Council Against Sexual Violence board of directors, for which he devoted seven (7) years of his service. In the last two years, Mr. Dolce initiated a new legislative effort to secure sex crime victim privacy.[4] Mr. Dolce has previously served as an advisory board

---

[3] *See* Comp. Exh. B, "Give Abuse Victims More Time." The Palm Beach Post, July 11, 2009.

[4] *See* Comp. Exh. B, Dolce, Michael. "Sex-crime survivors deserve to protect their privacy." The Orlando Sentinel, February 25, 2021 (https://orlandosentinel.newspapers.com/image/716855715).

member of Florida's Children First, a member of The Florida Bar's Legal Needs of Children Committee, and on the governing board of Holy Trinity Episcopal Church in West Palm Beach.

In recognition of Mr. Dolce's work on behalf of victims of sexual abuse, Mr. Dolce received numerous awards. These awards include, but are not limited to, the following:

- In 2009, Mr. Dolce founded the political committee, Protect Our Kids First, Inc., for which the Florida Council Against Sexual Violence recognized Mr. Dolce with its "2010 Survivor Activist" award.

- On June 10, 2010, Mr. Dolce received the "Special Contribution to the Advancement of the Civil Justice System" award, given by the Florida Justice Association in recognition for outstanding individual commitment and selfless personal efforts to protect the rights of individuals and improve the civil justice system in Florida.

- In 2017, the Coalition for Independent Living Options Inc. presented Michael Dolce a Special Acknowledgment Award for his Commitment to Ending Sex Crimes against People with Disabilities.

Mr. Dolce has three children. One of his children, Ilya Dolce ("Ilya"), was adopted at the age of four (4) by Mr. Dolce and his first wife from an orphanage in Russia. Ilya suffered from mild cerebral palsy, fetal alcohol exposure, neurological and development delays, central auditory processing issues, and bipolar disorder. [PSR ¶64] Not all of such conditions were disclosed to Mr. Dolce and his wife at the time of the adoption. Mr. Dole's divorce from his first wife flowed from an

irreconcilable difference between the two over the care of Ilya. *Id*. The former wife wanted to reverse the adoption and return Ilya, whereas Mr. Dolce wanted to raise him in a loving environment, despite Ilya's medical challenges. *Id*.

In 2019, Mr. Dolce's son, Ilya, then 25 years old, was despondent and took his own life while on the phone with Mr. Dolce. While Mr. Dolce was on the phone trying to calm his son, Mr. Dolce's wife, fearing Ilya intended to commit suicide, had called the police. The last words Mr. Dolce heard from Ilya, as he heard the sound of a police siren in the distance, was "Did, you called the police?" The last sound Mr. Dolce heard during that call was a gunshot.

In an attempt to cope with his son's tragic passing, Mr. Dolce wrote a book about raising his son to preserve his memory and help others cope with similar tragedies. *See Exh. C* (*Nothing Compared to a Lifetime*, by Michael Dolce).

As the PSR, the newspaper articles, the award bestowed upon Mr. Dolce, and the letters of support indicate, Mr. Dolce placed advocacy on behalf of child sexual abuse victims above himself. He devoted himself to their cause, but not without a steep cost to his mental health. Mr. Dolce's mental health was greatly affected by his efforts, often requiring him to relive his own trauma daily. Through his work and public advocacy, Mr. Dolce exposed himself daily to the ancillary trauma that accompanies hearing and recounting the stories of abuses, including sharing his own, both publicly and privately; he absorbed it, internalized it and suffered as a result.

[PSR ¶74]

Mr. Dolce had already required psychiatric hospitalization before his son's passing. [PSR ¶73] The tragic passing of Ilya that aggravated and compounded Mr. Dolce's PTSD. Mr. Dolce's mental health suffered a marked decline. Despite his internal struggles, Mr. Dolce continued to tirelessly advocate for other victims. None of this absolves him of his crime, but surely his efforts on behalf of others must be mitigating factors that separate him from others charged with the same acts.

As noted in the PSR, Mr. Dolce was receiving counseling up to February 2023. [PSR ¶74] Mr. Dolce found himself drawn to the very thing that caused him so much pain, the objectification of children. Yet, he was not open enough with his therapist or himself to acknowledge he needed specialized care for that affliction.

Mr. Dolce has accepted his guilt for possessing child pornography, but is committed to getting the care he needs, and being a productive and law-abiding member of society. Yet, the life Mr. Dolce lived is over, both professionally and personally. At the age of 54, he has lost his home, his livelihood, and he will never practice law again. He will never recover from the obliteration of his reputation. All his efforts on behalf of others will forever be overshadowed by his crime.

In many ways, and for many years, Mr. Dolce sacrificed himself for the betterment of others and the betterment of society at large through his advocacy for

survivors of abuse.[5] Since Mr. Dolce's arrest, the PTSD from his childhood trauma has been exacerbated and triggered by his jail surroundings, which resemble the basement where he was abducted and sexually abused.

Very soon, Mr. Dolce will stand before the Court to be sentenced. What he needs more than anything is treatment. In addition to the court's inherent post-Booker authority to grant a downward variance, the guidelines themselves provide additional authority to depart in exceptional circumstances. U.S.S.G. § 5H1.3 contemplates that there are other grounds for departure beyond that which are enumerated in the guidelines, including mental and emotional conditions, individually or in combination with other offender characteristics, when present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

### D. This Court Should Join Numerous Other Courts, Find Section 2G2.2 Overly Punitive, And Vary Downward.

As noted above, this Court can vary from the sentencing guidelines simply because it disagrees with a particular policy reflected by them. *See Spears v. United States*, 555 U.S. 261, 264 (2009) (*Kimbrough* recognized "a district court's authority to vary from the crack cocaine guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive

---

[5] A collection of letters in support of Mr. Dolce are included in *Comp. Exh. D*.

sentence in a particular case.")

District Courts, both local and outside this circuit, have routinely varied downward significantly in § 2G2.2 cases. In fact, many judges across the country have imposed sentences with little or no incarceration in cases like Mr. Dolce's, where the government charged possession, rather than receipt or distribution.[6]

---

[6] *See United States v. Matthew Hutzell*, 3:14-CR-007 (W.D. PA 2020) (one day in custody, ten years supervised release for man with history of abuse as a child who started looking at CP as coping mechanism, who completed four years of sex offender treatment while on pretrial release with no violations); *United States v. Zimmerman*, 17-CR-33-JLQ (E.D. WA 2017) (received sentence of one day incarceration and six months home detention for pharmacist with virtually no criminal history with documented history of mental illness including psychotic delusions dating back nineteen years); *United States v. Dirisio*, 15-CR-049 (S.D. Iowa 2015) (time served with ten years of supervision for with significant mental impairments and history of physical and mental abuse as a child); *United States v. Zofchak*, 14-CR-20538 (E.D. Mich 2015) (ten years of supervised release based on mental health issues); *United States v. Bender*, 12-CR-128 (M.D. Fla. 2013) (sentenced to time served (one day) followed by 10 years of supervised release with two years on home confinement where defendant was young, suffered from depression, was vulnerable to abuse in prison presented a low risk of harm to others, and was doing well in treatment); *United States v. Teays*, No. 09-CR-532 (E.D. Cal. 2012) (sentenced to five years' probation where defendant had been the victim of sexual abuse as a child, was socially withdrawn, and had been undergoing successful counseling); *United States v. Tucker*, No. 11-CR-00252 (M.D. Fla. 2012) (sentenced to time served (one day) followed by 15 years of supervised release, with 18 months in home detention with electronic monitoring); *United States v. Carswell*, No. 2:13-cr-00055-MHT-CSC, 2013 WL 12116243 (M.D. Ala. 2013) (sentenced to 20 days imprisonment as time-served, time served, for one count of child pornography possession using peer file-sharing network); *United States v. Hall*, No. 12-CR-20119 (W.D. Tenn. 2013) (as corrected on Feb. 20, 2013) (sentenced to time served (one day) followed by ten years of supervised release, with five years on home confinement, where defendant had been sexually abused as a child, suffered from serious medical problems and depression, and had a long work history); *United States v. Reardon*, 11-CR-10325 (D. Mass. 2012) (sentenced to five years' probation

## **CONCLUSION**

In light of the absence of criminal history, his past trauma which haunts him daily, his previous service to the community, and his low risk of reoffending, Mr. Dolce is requesting a sentence of nine months incarceration, followed by either probation or supervised release. The sentence requested in this case would not be anomalous given the cases cited above. Mr. Dolce prays this Court will show him mercy.

Respectfully submitted,

_____/s/ Leonard Feuer_____
LEONARD FEUER, ESQUIRE
Florida Bar No.: 501751
Leonard Feuer, P.A.
500 S. Australian Avenue, Suite 500
West Palm Beach, FL 33401
Telephone:  (561) 659-1360

---

where the defendant was very timid and had a history of bipolar disorder and suicide attempts); *United States v. Syzmanski*, No. 08-CR-417 (N.D. Ohio 2011) (sentenced to one day in prison followed by five years of supervised release where 54-year-old defendant had strong work record and community support, health problems, and therapist indicated that he presented no risk to children); *United States v. Ramos*, No. 08-CR-30034 (D. Mass. 2010) (sentenced to four years' probation, twelve months of which in a halfway house, where defendant had no criminal history and had suffered from major depression over many years); *United States v. E.L.*, 188 F. Supp. 3d 152, 154 (E.D.N.Y. 2016) (five years probation for defendant who began using child porn when he was depressed and isolated); *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (defendant had no criminal history, was remorseful and undergoing treatment, which was likely to be effective; sentenced to one day in prison followed by 10 years supervised release plus a $5,000 fine); and *United States v. D.M.*, 942 F. Supp. 2d 327 (E.D.N.Y. 2013) (22-year-old defendant was given five years of probation for possessing several hundred images and videos where defendant was exposed to porn as a 13-year-old boy by a friend).

Fax:        (561) 249-4100
lfeuer@feuerlawfirm.com

## **CERTIFICATION OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished this 13th day of December 2023 by ECF/CM to all parties hereto.

_/s/ Leonard Feuer_____
LEONARD FEUER, ESQUIRE
Florida Bar No.: 501751